# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| MCLANE COMPANY, INC., | § | |
| | § | Civil Action No. 6:17-cv-00166 |
| **Plaintiff,** | § | |
| | § | |
| v. | § | (Cause No. 293,263-C; 169th Judicial |
| | § | District Court of Bell County, Texas) |
| ASG TECHNOLOGIES GROUP, INC. | § | |
| F/K/A ALLEN SYSTEMS GROUP, INC., | § | |
| | § | JURY TRIAL DEMAND |
| **Defendant.** | § | |

**PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY
JUDGMENT AND APPLICATION FOR INJUNCTIVE RELIEF**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, McLane Company, Inc. (hereinafter referred to as "McLane"), and files its Plaintiff's Amended Complaint, Application for Declaratory Judgment, and Application for Injunctive Relief and, in support of this amended complaint, shows the Court as follows:

## I.
## VENUE AND JURISDICTION

1.      The Defendant removed this case from state court.

2.      The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332 (a)(1) because the Plaintiff and the Defendant are citizens of different states and the amount in controversy exceeds $75,000.00, excluding interest and costs.

3.      Plaintiff is a corporation duly organized under the laws of the State of Texas with its principal place of business located in Temple, Texas.

4.      Defendant is a Delaware corporation registered to do business in the State of

Texas with its principal place of business located in Naples, Florida.

5.      This Court has jurisdiction over both the subject matter and the parties to this case. ASG is subject to this Court's jurisdiction pursuant to the Texas Long Arm Statute, Texas Civil Practice and Remedies Code §17.041 and §17.042(1), (2), and (3). ASG is registered with the Texas Secretary of State to conduct business in the State of Texas, and maintains an office in Arlington, Tarrant County, Texas. ASG has had sufficient minimum contacts in the State of Texas so as to not offend notions of fair play and substantial justice by requiring its defense of this litigation in Texas. Additionally, the subject matter of this lawsuit and the relief sought by McLane are within this Court's jurisdiction.

6.      Venue is proper in this district under 28 U.S.C. 1391 (c)(2) because the Defendant is subject to the Court's personal jurisdiction with respect to this civil action because all or a significant part of the events giving rise to this suit occurred in Bell County, Texas. Tex. Civ. Prac. & Rem. Code §15.002. This suit involves, in part, the breach of a contract that was negotiated by McLane in Bell County, Texas, and that was performable in Bell County, Texas. Tex. Civ. Prac. & Rem. Code §15.035. Additionally, ASG made certain material misrepresentations to McLane in Bell County, Texas. Tex. Civ. Prac. & Rem. Code §15.002.

## II.
## PARTIES

7.      McLane is a domestic corporation organized under the laws of Texas, with its principle place of business located in Temple, Bell County, Texas.

8.      Defendant, ASG Technologies Group, Inc. f/k/a Allen Systems Group, Inc. ("ASG") is a Delaware corporation registered to do business in the State of Texas. Its principal place of business is located at 708 Goodlette Road North, Naples, Florida 34102. ASG can be

served through its Registered Agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, located at 211 E. 7th Street, Suite 620, Austin, Travis County, Texas 78701.

## III.
## FACTS

9.      McLane is a $49 billion supply chain services leader. Its main offices are located at 4747 McLane Parkway in Temple, Bell County, Texas. McLane buys, sells and delivers more than 50,000 different consumer products to nearly 110,000 locations across the U.S. The products McLane manages include foods, beverages, tobacco, household items, over-the counter remedies, health and beauty aids, automotive products and more. The customers McLane serves include nationwide, familiar retailers.

10.      McLane has a reputation for long-standing relationships, reliable and accurate service, and an unwavering commitment to help its customers succeed. McLane is a wholly owned unit of Berkshire Hathaway, Inc. (NYSE: BRK) and employs 23,494 teammates, operates 83 distribution centers and owns one of the nation's largest private truck fleets. Such information is public record, recorded on McLane's website and in certain SEC filings.

11.      McLane is comprised of two primary business units – McLane Grocery and McLane Foodservice, Inc. – as well as several other subsidiaries in the food and beverage industry.

12.      In October, 2002, McLane entered into a written Software Licensing Agreement ("SLA") with Allen Systems Group, Inc. ("ASG"), whereby ASG provided a license to McLane to utilize certain software, including programs, options, technical and other user documentation, data, and information (hereinafter referred to as "Licensed Products"), as listed on an attached

Product Schedule. A true and correct copy of such SLA (without the Product Schedule) is attached hereto and incorporated herein as Exhibit "B[1]." In broad summary, McLane uses the Licensed Products for displaying reports for business applications such as financials, billing, customer service, tax compliance, human resources, records retention, logistics, payroll operations and inventory.

13.     In 2003, McLane entered into a License Agreement with Mobius Management Systems, Inc. ("Mobius"), herein referred to as the "2003 Mobius Agreement." This agreement was for an initial term of three (3) years. By virtue of the 2003 Mobius Agreement, Mobius granted a license to McLane for the use of certain computer software components described on Exhibits and Addenda attached to the agreement. A true and correct copy of the 2003 Mobius Agreement is attached hereto and incorporated herein as Exhibit "C." Attached to the 2003 Mobius Agreement, and made a part of it, are two exhibits ("Exhibit 'A'" and "Exhibit 'B'"). Ex. C. Each has a corresponding Addendum, which is also attached to and made a part of the 2003 Mobius Agreement. Of significance to this matter is paragraph 4 of the Addendum to Exhibit "B" to the 2003 Mobius Agreement, dated August 29, 2003, and related to one of the Licensed Products called "DocumentDirect," which states, in part:

> "…Licensee may permit its external customers the right to use up to an aggregate total of 50 concurrent sessions of DocumentDirect as selected, on this Exhibit. Such 50 DocumentDirect concurrent sessions may only be used by such external customer(s) to access the Mobius SYSTEM running on Licensee's server located at 4747 McLane Parkway, Temple, TX 76503…." *Id.*

14.     In 2006, Mobius and McLane executed a document dated June 30, 2006, and entitled "Exhibit 'C' to License Agreement," referring to the 2003 Mobius Agreement. Like the

---

[1] Exhibits attached to this complaint begin with "B" so as to match up to the exhibits attached to other pleadings or motions McLane has or will file herein.

other exhibits to the 2003 Mobius Agreement, "Exhibit 'C'" was accompanied by an Addendum. "Exhibit 'C' to License Agreement" and its Addendum are collectively referred to herein as the "2006 Mobius Renewal." A true and correct copy of the 2006 Mobius Renewal is attached and incorporated herein for all purposes as Exhibit "D." The 2006 Mobius Renewal extended the 2003 Mobius Agreement for an additional three (3) years, and contained a description of the software products licensed to McLane. Ex. D. One such software product was the DocumentDirect software program licensed in the 2003 Mobius Agreement. *Id.* But for the new terms specified in the 2006 Mobius Renewal, the original terms of the 2003 Mobius Agreement continued in effect. *Id.* By virtue of the language in the 2006 Mobius Renewal, the 2003 Mobius Agreement and Addenda expired on or about June 30, 2009. *Id.*

15.     The Addendum in the 2006 Mobius Renewal contains, in part, the following language related to the DocumentDirect software program:

> "...Licensee is permitted to allow customers to use up to an aggregate total of 50 concurrent sessions of the DocumentDirect product selected, on this Exhibit. For avoidance of doubt, such 50 DocumentDirect concurrent sessions may only be used by such customers to access the Mobius products running on Licensee's server located at 4747 McLane Parkway, Temple, TX 76503...." *Id.*

16.     In 2007, upon information and belief, ASG entered into a merger agreement with Mobius, whereby ASG acquired Mobius. Thereafter, in August 2007, Juan Cabezas, of ASG contacted McLane regarding a proposal for a five (5) year "Enterprise System License" ("ESL"). On or about August 22, 2007, Mr. Cabezas forwarded to Mr. Pat Hankins, then Vice-President of Information Technology for McLane, by e-mail a written proposal with a subject line of "ASG ESL Proposal," and containing attachments described on the e-mail as "McLane—Business as Usual..." A true and correct copy of the August 22, 2007, ASG e-mail proposal and attachments

are attached hereto and incorporated herein for all purposes as Exhibit "E." During discussions regarding this proposal, McLane specifically emphasized to the ASG representative the importance of maintaining the right to allow external users – McLane customers – to access the reports concerning their specific business with McLane. It was extremely important that McLane be permitted by any future license agreement to conduct "business as usual" as described and represented by ASG in its proposal.

17.     Following discussions with ASG's representatives, and the repeated assurances by ASG in 2007, verbally and in writing, that any new agreement would include the continued and long-standing right for McLane to allow its customers to retrieve reports from the software, McLane and ASG executed a document entitled "Product Schedule #5," (herein referred to as "PS5"), a true and correct copy of which document is attached hereto and incorporated herein as Exhibit "F." PS5 stated an effective date of September 1, 2007. Ex. F. PS5 was also stated to be an integral part of the 2002 SLA between McLane and ASG. *Id*. PS5 further stated that the Licensed Products included the following:

> "…ORIGINAL LICENSED PRODUCT(S) and ORIGINAL EFFECTIVE DATE(S):
>
> June 30, 2006 (Originally licensed for a three (3) year term through Mobius Management Systems, Inc ("Mobius Licensed Products")
>
> Unrestricted ASG-DocumentDirect for the Internet-NT…" *Id*.

18.     Additionally, on page 3 of said PS5 the following language was included:

> "…Upon execution of this Agreement…ASG hereby converts Client's licenses for (i) the Mobius Licensed Products from a Three (3) Year Term License…to a Five Year Enterprise Subscription License restricted to the above listed capacities…" *Id*.

The "above-listed capacities' as described in the document related to a limit on the maximum volume of bits of data, being 5000 MIPS, but had no bearing on McLane's right as permitted in the Mobius agreements to permit customers, as external users, to obtain reports via the DocumentDirect program. *Id.*

19.     During the term of PS5 there were no concerns raised by ASG regarding McLane's use of the DocumentDirect program to allow its customers to access reports from the software. Thereafter, at the end of the stated five (5) year term of PS5 in 2012, ASG forwarded to McLane a new product schedule, entitled "Product Schedule #6," herein referred to as "PS6," which document was to serve as a renewal of PS5 with the same rights allowed McLane as in prior agreements, including McLane's right to permit external users, being its customers, to access McLane's reports by way of the DocumentDirect software. PS6 was stated to be effective September 1, 2012, and to have a five (5) year term, which will end on August 31, 2017.  A true and correct copy of PS6 is attached hereto and incorporated herein as Exhibit "G." As with PS5, PS6 was stated to be an integral part of the 2002 SLA. Ex. G. During the discussions concerning the renewal, there were no statements by ASG that the renewal terms would not be "business as usual" for McLane, including the right of McLane to utilize the software to provide reports to its customers.

20.     PS6 contained, on page 2, the following statements…

"…Client may utilize the Licensed Product(s) licensed by MIPS capacity listed on Exhibit A for its own internal use and benefit and only as the total capacity of all CPUS at the Designated Location does not exceed five thousand (5,000) MIPS…

….Client may utilize the Licensed Product(s) listed on Exhibit B for its own internal use and benefit at the Designated Location at an unlimited capacity…."

Ex. G. Exhibit "B," attached and made a part of PS6, is entitled "**(MSL) ENTERPRISE SUBSCRIPTION LICENSE FOR MOBIUS.**" *Id*. Such Exhibit then lists the programs licensed, including the program, "ASG—DocumentDirect," which is the same program utilized by McLane for the previous nine (9) years to provide access to its reports to its customers. *Id*.

21.     In the years 2012 through 2016, ASG made no inquiry, nor stated any objection to McLane's continued long-standing use since 2002 of the Licensed Products to allow McLane's customers to obtain McLane's reports of the customers' business with McLane. However, in January 2017, ASG requested McLane to permit ASG to perform a "Health-Check" of its Licensed Products in anticipation of its negotiating its renewal terms to be effective upon the end of the current agreement in August 2017. McLane voluntarily and without hesitation agreed to participate in the "Health Check." In preparation for the "Health-Check" ASG advised McLane to work with its Texas Field Account Representative, Mr. Monte Gomillion, on  a questionnaire, which requested that McLane advise ASG of the number of customers that are accessing reports from the "ViewDirect Repository." Such software "repository" is an access portal, and is a part of the DocumentDirect software program through which McLane has always provided reports to its customers. McLane responded that approximately 300 customers access McLane's customer reports through the ViewDirect Repository (this number is in fact too high). The actual number is approximately 97 customers. User counts were done over an 18-month period, with concurrent usage detailed over a 75-day period from 12/1/2016 and 2/3/2017. Both McLane teammates and external customers and users were sampled. External customers and users accounted for approximately 6.30% of total users or an average of 6 concurrent external customers or users. McLane believes it has fully complied with the "…not more than 50 concurrent users..." restriction recited in the Mobius agreements.

22.     ASG then provided to McLane its written report from the results of the Health-Check entitled "ASG Technologies Presents This ASG-Mobius Health Check for McLane Company" and dated February 21, 2017, herein referred to as the "ASG Report." A true and correct copy of the ASG Report is attached as Exhibit "H." Contained within the ASG Report is an introduction, which states, in part:

> "…The Mobius Health Check is a consultative engagement that takes into account every aspect of your current rollout and configuration of the ASG-Mobius ASG-ViewDirect (INFOPAC) solution suite, with the goal of ensuring that you are running a healthy, efficient and cost-effective content and information management solution.  The engagement also attempts to point out and highlight opportunities for improvement.  This Mobius Health Check is a living document to be used by McLane and ASG as a benchmark for actionable items…." Ex. H.

23.     The ASG Report then makes reference to the questionnaire answered by McLane as to customer access. Ex. H. It states that the 2002 ASG SLA does not allow such access, without ASG approval and payment of "applicable fees." *Id.* ASG then states, in part, that the remedy for such "unauthorized access/benefit is to amend the agreement to expand the usage rights to include McLane's customers, and states, "…As there may be more than one way to license the necessary rights, ASG suggests an open dialogue to identify and explore the options…." *Id.*

24.     On March 24, 2017, ASG Texas Field Account Representative Monte Gomillion met with McLane at McLane's offices in Temple, Texas and presented to McLane a document entitled "August 30, 2017 Renewal Options," with a heading that stated "**3rd party unauthorized access from 2007—2017.**" The document contained a statement of what ASG believed to be what it would accept for McLane's past alleged "unauthorized usage," which was $1,199,852.00. The document additionally had attached several pages of options for renewal

with pricing for such options. A copy of such document with attachments is attached hereto and incorporated herein for all purposes as Exhibit "I." At the March 24, 2017, meeting with ASG's representative, McLane requested that ASG provide the parameters of resolution of this matter, should McLane make the decision not to renew its agreement with ASG at the end of the current term in August 2017. On March 27, 2017, the ASG field representative e-mailed to McLane that he was waiting for ASG Executive approval of such terms.

25.     McLane has refused to pay any money for an alleged unauthorized use of the software, as it has complied with the terms the agreements between it, ASG and Mobius. In addition, the options originally listed for renewal of the software license reflected an increase of more than 100% for the cost for the renewal, including the settlement fees requested by ASG, from $2,489,907 for the previous five (5) years to $5,012,778 for the five (5) year renewal. Such amount is exorbitant and demonstrates that ASG intends to charge excessive rates to renew the right for McLane to use software that has been deeply embedded and relied upon by McLane and its customers for many years in all of its grocery-related decision-making regarding sales, purchasing, customer service, transportation, warehouse, and other related functions. Also included are monitoring tools, security-related software, testing, and verification tools. McLane will require lead time until the expiration of its current agreement with ASG on August 31, 2017, in order to obtain and install new licensed software to maintain all of its grocery-related business functions.

26.     Discussions have intermittently continued between the parties; however, no resolution has been achieved. ASG has, instead, not altered its position as to the alleged unauthorized usage of the software and has not altered its position as to the payment they require for such "unauthorized" usage. On April 17th, the ASG Texas representative e-mailed McLane

with an arbitrary deadline that a renewal agreement with the new fees had to be executed by McLane by April 27, 2017. Additionally, on April 19, 2017, Mr. Gomillion e-mailed McLane advising that no extension of the April 27, 2017, deadline would be granted. A copy of such e-mails are attached hereto and incorporated herein as Exhibits "J" and "K," respectively.

27.     A meeting was held at the McLane Temple offices between McLane and ASG on Tuesday, May 2, 2017, to discuss the matter. No resolution was reached by McLane and ASG at that meeting. At the meeting, executives from ASG stated they would submit a final offer to resolve this dispute and renew the agreement between McLane and ASG by Friday, May 5, 2017. ASG's framing of the offer as being a "final" offer implied that ASG would follow through with its previous threat to immediately terminate McLane's use of the Licensed Products by turning off the software key if McLane did not accept the offer.

28.     On Thursday, May 4, 2017, ASG submitted a final proposal to McLane via e-mail. ASG's May 4, 2017, offer still sought exorbitant fees to renew the parties' agreement for a five (5) year term as well as payment by McLane of a substantial amount of money in "settlement" of its alleged breach of the previous agreements between the parties, which McLane continues to dispute. ASG gave McLane a deadline to respond to its May 4, 2017, offer by May 31, 2017. True and correct copies of ASG's e-mail regarding the proposal and the proposal are attached as Exhibit "L" and incorporated herein for all purposes.

29.     By e-mail dated May 8, 2017, McLane submitted to ASG various questions it had regarding ASG's May 4, 2017, proposal. McLane sought to understand whether the proposed "settlement" amount would be honored absent McLane's renewal of the contract for an additional term of five (5) years. McLane also asked ASG what its position regarding McLane's continued use of the software under PS6 until the stated expiration date of August 31, 2017.

PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY JUDGMENT AND                    P a g e  **11**
APPLICATION FOR INJUNCTIVE RELIEF

155732-55402

Additionally, McLane asked ASG if it intended to terminate McLane's ability to utilize the Licensed Products, and if so, when such termination would occur. A true and correct copy of McLane's May 8, 2017, e-mail to ASG is attached as Exhibit "M" and is incorporated herein for all purposes.

30.     McLane and ASG next communicated in a brief conference call on May 16, 2017. During the call, McLane reiterated to ASG that McLane was considering all of its options going forward, including ASG's May 4, 2017, proposal, and needed answers to the questions posed to ASG in McLane's May 8, 2017, e-mail in order to do so. ASG responded with such answers by e-mail dated May 17, 2017. ASG explained that the extended user fee was contingent upon a renewal of the SLA, and that ASG would not allow McLane to utilize the software until the expiration of the parties' current agreement on August 31, 2017, absent McLane's acceptance of the proposal. ASG further explained that if McLane did not accept the May 4, 2017, proposal it would formally terminate the parties' agreement following a 60 day cure period provided for in the agreement. ASG did not state whether it contended such period had already begun, or if it would begin upon submission to McLane of a formal notice of breach and termination. A true and correct copy of the ASG's May 17, 2017, e-mail is attached as Exhibit "N" and incorporated herein for all purposes.

31.     The next communication between McLane and ASG occurred on May 30, 2017, when ASG asked if McLane would respond to its May 4, 2017, proposal by the stated May 31, 2017, deadline. A true and correct copy of that e-mail is attached as Exhibit "O" and is incorporated herein for all purposes. On May 31, 2017, McLane notified ASG by e-mail that it could not agree to the terms of the May 4, 2017, proposal. McLane explained to ASG that it could not agree to pay retroactive fees for an alleged breach that McLane disputes. McLane

further explained that it could not accept the very large increase in license fees going forward, and that it intended to continue to abide by the parties' current agreement until it expires on August 31, 2017. A true and correct copy of McLane's May 31, 2017, e-mail is attached as Exhibit "P" and incorporated herein for all purposes.

32.     ASG first responded to McLane's May 31, 2017, e-mail informally with an e-mail of its own on May 31, 2017. ASG's e-mailed response explained that ASG would be sending a formal notice of termination, and does intend to terminate the current agreement (PS6) before its stated expiration date of August 31, 2017. Any such termination would necessarily include ending McLane's access to and use of the Licensed Products. A true and correct copy of ASG's May 31, 2017, e-mail is attached as Exhibit "Q" and incorporated herein for all purposes. On June 1, 2017, ASG sent a formal letter addressed to Eric Hildenbrand who is McLane's General Counsel for the Grocery Division. ASG's letter to Mr. Hildenbrand appears to have been sent as a formal notice of material breach, initiating a sixty day cure period before termination as contemplated in the parties' current agreement. However, the letter includes the following sentence: "Arguably, ASG's prior communications to McLane of this licensing issue constituted written notice under the Agreement, and the cure period has already elapsed." It is unclear from this letter when ASG intends to terminate McLane's usage of the Licensed Products. A true and correct copy of ASG's May 31, 2017, letter is attached as Exhibit "R" and incorporated herein for all purposes.

33.     If ASG terminates McLane's use of the Licensed Products before the expiration of PS6 by turning off McLane's software key, it would be catastrophic to McLane's day-to-day operations, as well as to the operations of its customers.

PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY JUDGMENT AND                    P a g e  **13**
APPLICATION FOR INJUNCTIVE RELIEF

155732-55402

34.     McLane uses the Licensed Products from ASG (and Mobius) in its operations across the country on a daily basis. McLane uses the Licensed Products to track data regarding sales and purchasing patterns. McLane uses the Licensed Products in its customer service department, and to manage logistics at its distribution centers. Additionally, McLane uses the Licensed Products monitoring tools, security-related software, testing, and verification tools. If ASG terminates McLane's use of the Licensed Products before the expiration of the license(s), McLane's operations would be irreparably harmed. McLane would no longer be able to gather, digest and utilize enormous amounts of data integral to running its Grocery division. It would affect McLane's entire system of warehousing and its management of its fleet of trucks. In short, McLane would be irreparably harmed by ASG's termination of McLane's usage of the Licensed Products until such time as McLane could find, purchase, and implement replacement software, which could take longer than six months to do.

35.     Some of McLane's customers have, since 2002, accessed McLane's reports in their daily operations as well. Using McLane's reports, McLane's customers are able to track the purchasing patterns of their customers, as well as other data that is important to their businesses. McLane's customers rely on these reports to successfully operate their companies. Some customers access their reports on a daily or weekly basis, while others do so on a monthly basis, or even more sporadically.  If McLane's use of the Licensed Products is terminated by ASG before the expiration of its license(s), each of the customers who access McLane's reports using the software will no longer be able to make decisions about their purchases from McLane. For many of these customers, McLane is their primary supplier of products such as foods, candy, beverages, tobacco products, household items, over-the-counter remedies, health and beauty aids, and more. They too would have tremendous difficulty operating their retail locations until

PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY JUDGMENT AND                    P a g e  **14**
APPLICATION FOR INJUNCTIVE RELIEF

155732-55402

McLane finds, purchases and implements (across the United States) a replacement software program.

36.     Not all of McLane's customers utilize the reports McLane has provided since 2002 using the Licensed Products. Nevertheless, every one of McLane's customers would be negatively impacted if McLane's use of the Licensed Products is terminated by ASG because of the essential role the Licensed Products play in McLane's internal operations. If ASG terminates McLane's use of the Licensed Products before the expiration of its license(s), McLane will suffer irreparable harm.

37.     ASG has threatened that it will, without notice, terminate McLane's access to the entire software program licensed by McLane from ASG by turning off McLane's software key, despite that the current agreement does not end until August 31, 2017. It would appear at the very least, ASG intends to terminate McLane's use of the Licensed Products by July 31, 2017, – a full month before the expiration of PS6. Should ASG take such drastic action, McLane will be irreparably harmed because it will be unable to make decisions regarding all aspects of its grocery-related businesses. There is not a way to quantify the damages that would occur to McLane as a result of ASG terminating its rights to the software without adequate and sufficient notice to allow the necessary time to locate and implement a replacement software system. As a result, such action by ASG will cause McLane irreparable injury for which damages are incapable of proper calculation.

## IV.
## BREACH OF CONTRACT

38.     McLane incorporates paragraphs 1-37 as if stated in full.

39.     When they entered into PS6 in 2012, ASG and McLane renewed and extended the

---

PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY JUDGMENT AND                    P a g e  **15**
APPLICATION FOR INJUNCTIVE RELIEF

155732-55402

agreements which included their previous course of dealing. There was an anticipatory breach by ASG of the agreements between the parties when it threatened to terminate McLane's use of the Licensed Products before the expiration of the term of PS6.

40.     McLane has a right, pursuant to their agreements (including the previous course of dealing), to access and use the Licensed Products during its transition to a new software suite. By threatening to terminate McLane's use of the Licensed Products before the expiration of the parties' agreements, ASG repudiated McLane's right to access and use the Licensed Products for the full term of its license, including the time it will need to transition to a new software system. ASG's conduct in this regard violates an implied covenant of good faith and fair dealing inherent in the parties' agreements. It also violates the implied license McLane has pursuant to the parties' agreements to use the software for a "reasonable time" following termination of the agreement to allow McLane to transition to a replacement system.

41.     Additionally, ASG breached the agreements (including the previous course of dealing) with McLane when it intentionally and unilaterally changed the terms regarding use of the Licensed Products by McLane's customers despite its representations to the contrary. McLane has suffered damages as a result of these breaches.

## V.
## PROMISSORY ESTOPPEL

42.     McLane incorporates paragraphs 1-41 as if stated in full.

43.     Pleading in the alternative, ASG made a promise to McLane that the written terms contained in PS6 were not materially different from their previous agreements (including their course of dealing). ASG could foresee that McLane would rely on those promises. McLane substantially relied on the promise to its detriment. Injustice can be avoided only by the legal

PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY JUDGMENT AND                    P a g e **16**
APPLICATION FOR INJUNCTIVE RELIEF

155732-55402

enforcement of the promise against ASG.

## VI.
## FRAUD

44.     McLane incorporates paragraphs 1-43 as if stated in full.

45.     Pleading in the alternative, ASG made material representations to McLane regarding the terms of McLane's use and the use by McLane's customers of the Licensed Products. ASG's representations were false. At the time ASG made the misrepresentations to McLane, ASG knew of their falsity, or made them recklessly without knowledge of their truth. ASG intended that McLane rely on the misrepresentations. McLane relied on ASG's misrepresentations, which reliance was foreseeable. As a result of McLane's reliance on the material misrepresentations made by ASG, McLane has suffered injury.

## VII.
## NEGLIGENT MISREPRESENTATION

46.     McLane incorporates paragraphs 1-45 as if stated in full.

47.     Pleading in the alternative, ASG made representations to McLane regarding the terms of McLane's use and the use by McLane's customers of the Licensed Products in a transaction in which ASG had a pecuniary interest. The representations made by ASG were false. ASG did not exercise reasonable care or competence in making the representations. McLane justifiably relied on ASG's representations. McLane has suffered damages proximately caused by its reliance on ASG's misrepresentations.

## VIII.
## APPLICATION FOR DECLARATORY JUDGMENT

48.     McLane incorporates paragraphs 1-47 as if stated in full.

49.     McLane seeks a declaratory judgment pursuant to Texas Civil Practice and

Remedies Code Chapter 37. Alternatively, McLane seeks a declaratory judgment pursuant to 28 U.S.C. §2201. McLane respectfully requests that the Court enter a judgment declaring that the terms of the agreements are ambiguous and must include the course of dealing between McLane and ASG. Additionally, and more specifically, McLane respectfully requests that the Court enter a judgment declaring that the terms of PS6 regarding the use of the Licensed Products by McLane's customers are ambiguous and must include the parties' course of dealing and that McLane has complied with the agreements (including the parties' course of dealing) in all material respects. A term that appears to be indefinite may be given precision by the course of dealing between the parties. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 239-40 (Tex. 2016) (quoting the Restatement (Second) of Contracts Section 33, comment a). Additionally, partial performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed. *Id.* (quoting Restatement (Second) of Contracts Section 34(2)). "When the parties' actions demonstrate that they intended to 'conclude a binding agreement, even though one or more terms . . . are left to be agreed upon . . . courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.'" *Id.* (quoting Restatement (Second) of Contracts Section 33(2), comment a). The law favors finding agreements sufficiently definite for enforcement, "particularly . . . where one of the parties has performed his part of the contract." *Tanenbaum Textile*, 423 S.W.2d at 637. McLane further requests that the Court enter a judgment declaring that McLane has not breached the terms of PS6.

50.     McLane further requests the Court declare the exclusion in PS6 of express authorization for up to 50 of McLane's customers to concurrently use the Licensed Products was the result of the unilateral mistake of ASG or, alternatively, the mutual mistake of the parties.

51.     McLane further requests the Court declare its use of the Licensed Products by

PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY JUDGMENT AND                    P a g e **18**
APPLICATION FOR INJUNCTIVE RELIEF

155732-55402

McLane's customers was authorized by PS6, based on the terms of the agreements and the parties' course of dealing since 2002.

## IX.
## CONDITIONS PRECEDENT

52.     All conditions precedent necessary to maintain this action have occurred or have been performed.

## X.
## APPLICATION FOR INJUNCTIVE RELIEF

53.     McLane incorporates paragraphs 1-52 as if stated in full.

54.     Based on the foregoing, McLane has a probable right of recovery. If ASG terminates McLane's use of the Licensed Products before the expiration of PS6 in August 2017, McLane will suffer irreparable harm. McLane would very likely be placed in a position of breach of contracts with its customers. Additionally, McLane has no adequate remedy at law to compensate for such harm.

55.     Money damages cannot adequately compensate Plaintiff, even if Defendant were to respond in payment of money damages. Without the use of the Licensed Products, McLane's day to day operations across the company will come to a crawl.

56.     Greater injury will be inflicted upon McLane by the denial of injunctive relief than would be inflicted upon ASG by granting such relief. By granting temporary injunctive relief, the Court will be restoring and maintaining the status quo until a full trial on the merits can be held.

57.     The issuance of injunctive relief will not disserve the public interest. The issuance of injunctive relief will serve the public interest in insuring the continued availabilty of necessary and common retail products in the nation's largest retailers pending a trial on the

PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY JUDGMENT AND                    P a g e **19**
APPLICATION FOR INJUNCTIVE RELIEF

155732-55402

merits. Balancing the equities and other factors including the significant harm to McLane and its customers without injunctive relief with the lack of harm due to the entry of injunctive relief demonstrates that the relief will not disserve the public interest.

58.     Not all of McLane's customers utilize the reports McLane has provided since 2002 using the Licensed Products. *Id.* Nevertheless, every one of McLane's customers would be negatively impacted if McLane's use of the Licensed Products were terminated by ASG because of the essential role the Licensed Products play in McLane's internal operations. Ex. A. If ASG terminates McLane's use of the Licensed Products before the expiration of its license(s), McLane will suffer irreparable harm. In anticipation of ASG's stated threats, McLane has gone to extraordinary efforts to move McLane's customer report functions of the Licensed Products to other software platforms. This process has been accomplished for all external customers and users using McLane's reports with the major exception of two (2) customers. McLane estimates that the transition for these two (2) companies will be accomplished prior to approximately July 31, 2017. McLane has paid the contract through August 31, 2017. These extraordinary measures regarding transitioning McLane customer reports do not lessen McLane's need to continue the rest of the functions of the Licensed Products until the end of the contract scheduled for August 31, 2017. *Id.*

59.     Pending a final determination of this action on its merits, and after notice and a hearing, McLane seeks a Temporary Injunction enjoining and restraining ASG, and its parents, affiliates, subsidiaries, directors, officers, employees, agents, independent contractors and all other persons or entities acting in concert with it, from directly or indirectly terminating, limiting, interfering, or otherwise altering McLane's continued use of the Licensed Products in the same manner in which it has used those products since 2002 until August 31, 2017.

# XI.
## ATTORNEYS' FEES

60.     As a result of ASG's wrongful conduct toward McLane, McLane has been required to seek the assistance of counsel. McLane respectfully requests that it be awarded its reasonable and necessary attorneys' fees pursuant to Texas Civil Practice and Remedies Code Sections 37.009 and 38.001.

### PRAYER

McLane Company, Inc., respectfully requests that ASG be cited to appear and answer, and that after notice and a hearing, the Court sign a Temporary Injunction – effective until August 31, 2017 – on the merits enjoining and restraining ASG, and its parents, affiliates, subsidiaries, directors, officers, employees, agents, independent contractors and all other persons or entities acting in concert with it, from directly or indirectly terminating, limiting, interfering, or otherwise altering McLane's use of the Licensed Products in the same manner in which it has used those products since 2002 until August 31, 2017.

McLane further requests that, upon trial on the merits, the Court enter a final judgment in favor of McLane, and granting McLane the following relief:

A.      The Court enter a judgment declaring:

    1.      That the terms of the agreements are ambiguous and must include the course of dealing between McLane and ASG;

    2.      That the terms of PS6 regarding the use of the Licensed Products by McLane's customers are ambiguous, must include the parties' course of

dealing and that McLane has complied with the agreements (including the parties' course of dealing) in all material respects;

3.     That McLane has not breached the terms of PS6;

4.     That the exclusion in PS6 of express authorization for up to 50 of McLane's customers to concurrently use the Licensed Products was the result of the unilateral mistake of ASG or, alternatively, the mutual mistake of the parties; and,

5.     That McLane's use of the Licensed Products by McLane's customers was authorized by PS6, based on the terms of the agreements and the parties' course of dealing since 2002;

B.     An award of damages within the jurisdiction limits of the Court;

C.     An award of pre-judgment and post-judgment interest;

D.     An award of McLane's taxable costs of Court, and its reasonable and necessary attorneys' fees.

McLane respectfully requests all such other and further relief to which it is entitled at law or in equity.

Respectfully submitted,

**BAIRD, CREWS, SCHILLER & WHITAKER, P.C.**

By:        /s/ *Jack R. Crews*
                 **JACK R. CREWS**
                 State Bar Card No.: 05072300
                 Direct: (254) 743-7320
                 Email: jackcrews@bcswlaw.com
                 **KENNETH R. VALKA**
                 State Bar Card No.: 20435300
                 Direct: (254) 743-7350

PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY JUDGMENT AND        P a g e **22**
APPLICATION FOR INJUNCTIVE RELIEF

155732-55402

Email:  kenvalka@bcswlaw.com
**KEVIN K. BONNER**
State Bar Card No.: 24069398
Direct: (254) 743-7321
Email: kevinbonner@bcswlaw.com
15 North Main Street
Temple, Texas 76501
Fax: (254) 774-9353

ATTORNEYS FOR MCLANE COMPANY, INC.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff's Amended Complaint, Application for Declaratory Judgment and Application for Injunctive Relief and attached exhibits has been electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record for Defendant:

Martin R. Sadler                                          Via E-mail: msadler@lawla.com
Donna F. Thomisee                                   Via E-mail: dthomisee@lawla.com
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
801 Travis Street, Suite 1800
Houston, TX 77002
Fax: (713) 222-1996

Theresa H. Wang                                       Via E-mail: thw@stokeslaw.com
Shannon M. Jost                                        Via E-mail: smj@stokeslaw.com
Stokes Lawrence, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Fax: (206) 464-1496

On this 13 day of July, 2017.

_____/s/ Jack R. Crews_____
JACK R. CREWS

PLAINTIFF'S AMENDED COMPLAINT, APPLICATION FOR DECLARATORY JUDGMENT AND                    P a g e **23**
APPLICATION FOR INJUNCTIVE RELIEF

155732-55402